UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| MICHELLE D. HARRIS, | ) |  |
|---|---|---|
| Plaintiff, | ) ) ) |  |
| v. | ) ) | CAUSE NO. 1:11-CV-00405 |
| MICHAEL J. ASTRUE,<br>Commissioner of Social Security, | ) ) ) ) |  |
| Defendant. | ) |  |

## OPINION AND ORDER

Plaintiff Michelle Harris appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion.

### I. PROCEDURAL HISTORY

Harris applied for DIB and SSI in January 2009, alleging disability as of February 5, 2003. (Tr. 131-36.) The Commissioner denied her application initially and upon reconsideration, and Harris requested an administrative hearing. (Tr. 75-89.) On July 15, 2010, a hearing was conducted by Administrative Law Judge ("ALJ") John Pope, at which Harris, who was represented by counsel; Ashley Hortzman, a case manager at Cedars Hope; Elizabeth Anderson,

---

[1] All parties have consented to the Magistrate Judge. (Docket # 14); *see* 28 U.S.C. § 636(c).

a behavioral technician at the Carriage House; and a vocational expert testified. (Tr. 32-70.) On August 24, 2010, the ALJ rendered an unfavorable decision to Harris, concluding that she was not disabled because she could perform a significant number of other jobs in the economy. (Tr. 11-21.) The Appeals Council denied her request for review, at which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-6, 27-30, 256-61.)

Harris filed a complaint with this Court on November 29, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) She advances three arguments in this appeal: (1) that the ALJ improperly discounted the credibility of her symptom testimony; (2) that the residual functional capacity ("RFC") assigned by the ALJ and the hypothetical posed to the VE did not adequately reflect the ALJ's finding that she had moderate difficulties in concentration, persistence, or pace; and (3) that the ALJ improperly evaluated the testimony of her two witnesses, Ms. Hortzman and Ms. Anderson. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 10-16.)

## II. FACTUAL BACKGROUND[2]

*A. Background*

At the time of the ALJ's decision, Harris was thirty-nine years old; had a high school education; and possessed work experience as a certified nursing assistant, cashier, and shelver. (Tr. 38, 251, 255.) She alleges disability due to bipolar disorder and borderline personality disorder. (Opening Br. 2.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 1,192-page administrative record necessary to the decision.

### B. Harris's Testimony at the Hearing

At the hearing, Harris testified that she is divorced and for the past five months had been living with a roommate in a duplex at Cedars Hope, a housing campus for homeless women with mental illness. (Tr. 37-38, 45, 57.) She assists with various household chores at Cedars Hope, such as laundry, dishes, and vacuuming, and, from time to time, takes a walk or sews. (Tr. 46.) She no longer drives a car because it makes her anxious. (Tr. 38.) She stated that she currently works five hours per week cleaning at a tanning salon; she last worked full time as a nursing assistant for several months in 2007. (Tr. 39.)

In a typical day, Harris's roommate wakes her, and she then goes to "the main house" to receive her medications. (Tr. 41.) She performs her self care independently and, somewhere between 9:30 and 10:30 a.m., takes the bus with her roommate to the Carriage House, a day treatment program for individuals with mental illness. (Tr. 42, 45.) Once there, Harris volunteers in the kitchen, filling orders and dishing up food; she then takes the 1:00 p.m. bus back to Cedars Hope. (Tr. 42-43.) From 1:30 to about 4:00 p.m., Harris rests in her room by listening to music, watching television, or reading. (Tr. 43.) If it is her turn to assist with meal preparation, Harris works in the kitchen from 4:00 to 5:00 pm. (Tr. 43-44, 58-59.) After dinner, she sits outside, visits with other residents, or calls her mother or children. (Tr. 44-45, 53.)

Harris stated that in 2007 she started hearing voices "really bad," but that "it's not as bad now." (Tr. 46.) She explained that it is hard for her to keep a weekly schedule in that she has difficulty concentrating, easily becomes overwhelmed, and, at times, feels helpless, hopeless, and afraid of people (Tr. 47, 50, 54-56, 57-59); she depends upon her case manager to schedule and take her to her appointments (Tr. 50-51, 54-55, 57-59). She takes several medications for

her mental condition, which are helpful but make her feel "kind of tired" for about one-half of the day. (Tr. 40.) She also just recently started attending a women's addiction recovery group three times a week at Park Center. (Tr. 47-48, 53) She confided that she is a recovering crack addict and that she had not used crack or drank alcohol in the past six months. (Tr. 51-52.)

### C. *Ms. Hortzman's and Ms. Anderson's Testimony*

Ms. Hortzman, a case manager at Cedars Hope, and Ms. Anderson, a behavioral technician at the Carriage House, also testified at the hearing on Harris's behalf. (Tr. 57-66.) Ms. Hortzman stated that she has contact with Harris about four to five hours each day; she reported that Harris was "doing well" at Cedars Hope, but that she needs staff around her to "help her with her stressors," schedule and take her to appointments, and help her with certain daily living skills, such as cleaning and cooking. (Tr. 58-59.) Ms. Hortzman thought that without the structured living environment, Harris would have difficulty keeping to a daily routine. (Tr. 59.) Ms. Anderson testified that she spends two to three hours a day with Harris when she is at the Carriage House. (Tr. 64.) Ms. Anderson felt that a job requiring Harris to work ten hours per week was "too much" for her and thus secured her a cleaning job that requires just five hours per week. (Tr. 65.)

### D. *Summary of the Medical Evidence*

In October 2006, Harris was hospitalized for four days at the Northeastern Center, stating that she was "tired of living like this." (Tr. 428.) She had been using crack cocaine and alcohol and was unable to stop using while in the community; thus, she sought inpatient care for detox. (Tr. 428.) She was assigned a Global Assessment of Functioning ("GAF") score of 22 upon

4

admission and 48 upon discharge.[3] (Tr. 428.)

In January 2007, Harris was evaluated by Dr. Houshmand Rezvani, a psychiatrist at Park Center. (Tr. 304-08.) Harris reported mood swings, anger, aggression, irritability, high energy, restlessness, racing thoughts, and pressured speech. (Tr. 305.) Dr. Rezvani noted that most of her symptomology had been present when abusing alcohol and cocaine. (Tr. 305.) He diagnosed her with polysubstance abuse and cluster B personality traits and assigned her a GAF of 55. (Tr. 307.)

In March, Harris admitted herself to Parkview Behavioral Health for one week, reporting despondency from using drugs and prostituting herself. (Tr. 1147-50.) Her GAF was 30 upon admission and 50 upon discharge. (Tr. 1149.)

Harris was hospitalized again from June 26 to July 3, 2007, at Adams Memorial Hospital due to depression and suicidal thinking. (Tr. 438-40.) She was assigned a GAF of 40 and diagnosed with a history of bipolar affective disorder, rule out mood disorder secondary to substance dependency, polysubstance dependency, and cluster B personality traits. (Tr. 439.) Just one week after discharge, Harris was readmitted for three days due to depression and suicidal thinking; she had been using crack cocaine and drinking alcohol since she was

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 21-30 reflects behavior that is considerably influenced by delusions or hallucinations, a serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation), or an inability to function in almost all areas (e.g., stays in bed all day; has no job, home, or friends). *Id*. A GAF score of 31 to 40 reflects some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or a major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., avoids friends, neglects family, and is unable to work). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id*. A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

discharged a week earlier. (Tr. 456-57.) She was again assigned a GAF of 40. (Tr. 457.) She received outpatient counseling in September and October 2007. (Tr. 534-38.)

Harris was hospitalized again at Adams Memorial Hospital from November 19 to 26, 2007, for detoxification. (Tr. 468-70.) In the past two months, she had been using prescription drugs, alcohol, and cocaine. (Tr. 468.) Her GAF upon discharge was 35 to 40. (Tr. 470.) She was readmitted on December 12, 2007, after overdosing; she was discharged on January 2, 2008, with a GAF of 40. (Tr. 489-91.) Also in December, Harris underwent a case management individual assessment through Park Center. (Tr. 265-67.) She was assigned a current GAF of 32 and a diagnosis of polysubstance dependence; bipolar disorder I, severe with psychotic features; and personality disorder NOS. (Tr. 269.) Upon discharge from Adams Memorial Hospital in January 2008, Harris went to a group home (Tr. 265); she tested positive for drugs while staying there and was referred to Harmony House for chemical dependency treatment (Tr. 280).

In July 2008, Harris was evaluated at Parkview Behavioral Health. (Tr. 1142.) She stated that she had not been taking her medications and had been up all week smoking crack and drinking. (Tr. 1142.) She was hearing voices telling her to kill herself. (Tr. 1142.) She was also seen that month by Dr. Don Marshall, a psychiatrist at Park Center, for medication management. (Tr. 329-31.) On mental status exam, she was anxious but otherwise the findings were normal. (Tr. 329-31.)

In January 2009, Dr. Larry Lambertson, a psychiatrist, evaluated Harris at Parkview Behavioral Health after a suicide attempt. (Tr. 301-03.) She was going through her longest period of sobriety, which was about five months, and was assigned a GAF of 35 to 40. (Tr. 302.)

In March 2009, Dr. Marshall completed a report of psychiatric status, assigning Harris a

6

diagnosis of bipolar I, polysubstance dependence, and borderline personality disorder. (Tr. 333-38.) Her current and highest-past-year GAFs were each 32. (Tr. 333.) Dr. Marshall found that Harris had family stressors, diminished interest in activities, depression, psychomotor agitation, decreased ability to think or concentrate, and poor judgment. (Tr. 337.) He noted that she was noncompliant with treatment and that there had been no signs of progress. (Tr. 338.)

In April, B. Randal Horton, a state agency psychologist, reviewed Harris' record and completed a psychiatric review technique form, finding that she had affective, personality, and substance addiction disorders. (Tr. 344-57.) He opined that she had a mild degree of limitation in daily living activities and social functioning, but moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 354.) Dr. Horton further found in a mental residual functional capacity assessment that Harris had moderate limitations in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and respond appropriately to changes in the work setting. (Tr. 340-42.) He concluded, however, that she could understand, remember, and carry out simple tasks; relate at least on a superficial basis with coworkers and supervisors; and manage the stresses of simple work with sobriety. (Tr. 342.) Dr. Horton's opinion was later affirmed by a second state agency psychologist. (Tr. 422.)

That same month, Harris began participating in a day program at Park Center, which consisted of two to three hours in the morning and two to three hours in the afternoon. From April 30, 2009, to June 30, 2010, Harris attended these sessions on 89 days. (Tr. 359, 364, 369, 374, 379, 384, 389, 580, 594, 599, 618, 626, 631, 636, 646, 651, 661, 666, 671, 681, 686, 696, 701, 706, 711, 716, 721, 726, 731, 741, 746, 751, 756, 761, 766, 771, 776, 781, 786, 791, 796,

7

801, 806, 811, 816, 821, 827, 835, 840, 845, 850, 855, 860, 865, 869, 875, 880, 885, 890, 895, 900, 905, 910, 915, 920, 930, 935, 940, 945, 950, 955, 960, 965, 970, 1002, 1007, 1012, 1033, 1043, 1048, 1053, 1058, 1063, 1068, 1073, 1078, 1083.) She also had other shorter sessions for case management, group therapy, and medical management. (Tr. 394, 399, 604, 610, 613, 824, 832, 975, 977, 979, 981, 983, 985, 987, 989, 991, 993, 99-96, 998, 1000, 1017-18, 1020-21, 1088-89.) In addition, she was seen by Dr. Marshall for medication management. (Tr. 641, 676, 925, 1023, 1028-29.)

On June 17, 2010, Dr. Marshall completed a mental impairment questionnaire, indicating diagnoses of bipolar disorder, polysubstance dependence, and borderline personality disorder. (Tr. 1038-40.) He listed the following signs and symptoms: mood disturbance, emotional lability, generalized persistent anxiety, substance dependence, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, and difficulty thinking or concentrating. (Tr. 1038.) He wrote that Harris would be absent from work about four days a month due to her mental impairments; that her symptoms were worsened by her substance abuse; and that if she returned to full-time work, her mental functioning would likely decrease. (Tr. 1039-40.) When asked whether she would still have limitations in her mental functioning if she stopped abusing drugs and alcohol, Dr. Marshall responded: "It is difficult to determine. She would still be impaired but could probably work in a low stress, structured environment." (Tr. 1040.) When asked to elaborate on this point, Dr. Marshall stated:

> [Harris] does have mood swings, . . . a shortened attention span, anxiety, and restlessness but her major disability results when she is using drugs. *In a very structured environment*, in the absence of drug use, she may be able to tolerate employment *in a low stress, low demand environment*.

(Tr. 1091 (emphasis added).)

8

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental

9

impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[4] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On August 24, 2010, the ALJ issued the decision that ultimately became the Commissioner's final decision. (Tr. 11-21.) He found at step one of the five-step analysis that Harris had not engaged in substantial gainful activity after her alleged onset date and, at step two, that her affective disorder, personality disorder, and substance addiction disorder were

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

10

severe impairments. (Tr. 13.) At step three, the ALJ determined that Harris's impairment or combination of impairments were not severe enough to meet or equal a listing. (Tr. 14.)

Before proceeding to step four, the ALJ determined that Harris's symptom testimony was not reliable to the extent it portrayed limitations in excess of the following RFC:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to unskilled work requiring no more than superficial interaction with coworkers and supervisors.

(Tr. 15-16.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Harris was unable to perform her past relevant work as a certified nursing assistant. (Tr. 19.) At step five, however, the ALJ found that she could perform a significant number of other jobs in the national economy, including hand packager, bench assembler, and inspector. Accordingly, Harris's claims for DIB and SSI were denied. (Tr. 21.)

### C. The ALJ's Credibility Determination Will Be Remanded

Harris contends, among other things, that the ALJ improperly discounted the credibility of her symptom testimony. Because his reasoning with respect to Harris's credibility determination is flawed, at least in significant part, the ALJ's credibility determination will be remanded.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th

Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness . . . .").

Here, the ALJ found that Harris had an underlying medically determinable physical impairment that could reasonably be expected to produce her alleged symptoms. (Tr. 16.) The ALJ then evaluated the functionally limiting effects of Harris's alleged symptoms to determine the extent to which they would affect her ability to do basic work activities. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p. After reviewing the medical evidence, Harris's daily activities, and treatment history, the ALJ concluded that Harris's statements concerning the intensity, persistence, and limiting effects of her symptoms were not credible to the extent they were inconsistent with the RFC he had assigned for "unskilled work requiring no more than superficial interaction with coworkers and supervisors." (Tr. 15-16.) Specifically, the ALJ found that Harris's credibility was undermined by the fact that she was working part time (Tr. 16, 18), was "minimally engaged in treatment" (Tr 17), her symptoms increased in severity when using alcohol or drugs (Tr. 18), and her medications had been "relatively effective in controlling [her] symptoms" (Tr. 18).

But the ALJ's logic with respect to the cornerstone of his credibility determination—Harris's part-time job—is significantly flawed. In that regard, the ALJ stated:

> The claimant testified that she is currently working 5 hours a week at New Haven Tanning Salon. *The fact that the claimant's allegedly disabling impairments are not preventing her from working strongly suggests that it would not prevent work on a full-time basis (i.e., 32-40 hours a week).*

(Tr. 18 (emphasis added).) The Seventh Circuit Court of Appeals has emphasized that "[t]here is

12

a significant difference between being able to work a few hours a week and having the capacity to work full time." *Larson v. Astrue*, 615 F.3d 744, 752 (7th Cir. 2010). And here, the ALJ's reasoning is particularly dubious considering that Harris worked just five hours per week; her employment was arranged through the Carriage House; she resides in a structured, supportive environment; and a staff member worked in her place if she became ill. Under these circumstances, "we are hard-pressed to understand how [Harris's] brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations." *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011); *see, e.g.*, *Brent v. Astrue*, No. 11 C 0964, 2012 WL 2921576, at *10 (N.D. Ill. July 17, 2012) (concluding that the claimant's part-time Avon work should not be equated with an ability to work full time where her schedule was flexible and she was assisted by her daughter). Thus, the ALJ's attempt to equate Harris's five-hour-per-week job with an ability to perform full-time employment places his credibility determination on shaky ground.

Nor does the ALJ 's reliance on Harris's noncompliance or "minimal" compliance with treatment particularly bolster his credibility determination, as the ALJ never asked Harris about the reasons why she failed to consistently comply with treatment. *See* SSR 96-7p, 1996 WL 374186, at *7 (explaining that an ALJ must not draw adverse inferences about a claimant's symptoms from her failure to pursue regular treatment without first considering any explanations that she may provide or other information in the case record that may explain the noncompliance). Moreover, Harris explained at the hearing that at times she stopped taking her medications because she thought she was "doing okay" and then, upon relapsing, would attempt to "self-medicate" by using illegal drugs. (Tr. 53-54.) As the Seventh Circuit has emphasized,

13

"[m]ental illness in general and bipolar disorder in particular . . . may prevent the sufferer from taking her prescribed medications or otherwise submitting to treatment." *Kangail v. Barnhart*, 454 F.3d 627, 630 (7th Cir. 2006); *accord Jelinek*, 662 F.3d at 807; *Bradley v. Comm'r of Soc. Security*, No. 3:07-cv-599, 2008 WL 5069124, at *7 (N.D. Ind. Nov. 25, 2008). Accordingly, "it is questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Seamon v. Barnhart*, No. 05-C-13-C, 2005 WL 1801406, at *19-20 (W.D. Wis. July 29, 2005) (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)).

Admittedly, as the ALJ correctly noted, Harris's medications were relatively effective in controlling her symptoms and, as Dr. Marshall acknowledged, Harris's psychological symptoms increased in severity when abusing drugs and alcohol. Therefore, the ALJ's decision to discount the credibility of Harris's symptom testimony is not without some basis. Yet, these two reasons fail to assuage the Court's concern about the ALJ's significant reliance on Harris's part-time job and noncompliance with treatment in discounting her credibility, which fail to build an accurate and logical bridge to his conclusion. *See Ramey v. Astrue*, 319 F. App'x 426, 430 (7th Cir. 2009) (unpublished); *Carradine*, 360 F.3d at 755. Particularly here, where Harris was living in a highly structured living environment, her five-hour-per-week job was obtained through the Carriage House, and her volunteer work was performed in an environment designed to support those with mental illness. Accordingly, the case will be remanded so that the ALJ may reassess the credibility of Harris's report of disabling mental symptoms in accordance with Social Security Ruling 96-7p and build an accurate and logical bridge between the evidence of record and his conclusion.

*D. Harris's RFC Should Be Revisited Upon Remand*

Harris also argues that the RFC assigned by the ALJ and the hypothetical posed to the VE at step five fail to adequately accommodate all of her mental limitations—more particularly, her moderate deficits in concentration, persistence, or pace. Because the ALJ's path of reasoning from his consideration of Dr. Marshall's opinion to the assigned RFC is indeed difficult to trace, the ALJ should reexamine Harris's RFC upon remand.

As background, the Seventh Circuit has recognized that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "A treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."[5] *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "'Controlling weight' means that the opinion is adopted." *McMurtry v. Astrue*, 749 F. Supp. 2d 875, 888 (E.D. Wis. 2010) (citing SSR 96-2p). "A treating physician's opinion may have several points; some may be given controlling weight while others may not." *Id*. (citing SSR 96-2p).

Here, Dr. Marshall, Harris's treating psychiatrist, wrote that she had "mood swings, . . . a shortened attention span, anxiety, and restlessness but her major disability results when she is

---

[5] In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner must apply the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

15

using drugs." (Tr. 1091.) He opined that "[*i*]*n a very structured environment*, in the absence of drug use, she may be able to tolerate employment *in a low stress, low demand environment*." (Tr. 1091 (emphasis added).) He also stated, however, that her mental functioning would likely decrease if she returned to full-time work and that she would be absent from work about four days per month due to her mental impairments. (Tr. 1040.)

The ALJ explained that he gave Dr. Marshall's opinion "controlling weight" because "he is able to provide a detailed, longitudinal picture of [Harris's] impairments." (Tr. 19.) In fact, the ALJ even mirrored Dr. Marshall's restrictions when considering Harris's concentration impairments at step three of his sequential analysis: "With regard to concentration, persistence or pace, the claimant has moderate difficulties. Although the claimant testified that she needs encouragement to complete daily tasks and reminders to take medications, the evidence of record indicates the claimant has the ability to complete tasks *in less demanding, highly structured and supportive environments*." (Tr. 15 (emphasis added).) The RFC assigned by the ALJ, however, does not adequately incorporate these parameters.

On that front, the ALJ assigned Harris an RFC for "unskilled work requiring no more than superficial interaction with coworkers and supervisors." (Tr. 16.) "Unskilled work" is defined in the regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. §§ 404.1568(a), 416.968(a). "Although one reasonably could infer that a job that can be learned in no more than six months is likely to be 'routine,' it is equally reasonable to infer that some jobs that are easy to learn are stressful, such as jobs involving high production quotas . . . ." *Kusilek v. Barnhart*, No. 04-C-310-C, 2005 WL 567816, at *2 (W.D. Wis. Mar. 2, 2005). Therefore, the ALJ did not

16

necessarily account for the "structured . . . low stress, low demand environment" that Dr. Marshall identified. *Id*. Moreover, the ALJ never addressed Dr. Marshall's opinion that Harris would be absent about four days of work per month due to her mental impairments. This too is significant, as the VE testified that an individual is unemployable if she is absent from work more than two days per month. (Tr. 69.)

Yet, the RFC assigned by the ALJ *is* consistent with the opinion of Dr. Horton, the non-examining state agency psychologist, and the ALJ assigned this opinion "substantial weight." (Tr. 18-19.) Dr. Horton wrote that Harris could "understand, remember, and carry-out simple tasks" and could "manage the stresses of simple work with sobriety." (Tr. 342.) Therefore, the RFC assigned by the ALJ is not without support in the medical evidence.

But "[t]he court's review is confined to the rationale provided in the ALJ's decision." *Mandella v. Astrue*, 820 F. Supp. 2d 911, 921 (E.D. Wis. 2011). That is, "regardless whether there is enough evidence in the record to support the ALJ's decision, principles of administrative law require the ALJ to rationally articulate the grounds for [his] decision and confine our review to the reasons supplied by the ALJ." *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002). Here, Harris was living in a highly supportive setting at Cedars Hope, and her minimal part-time and volunteer work was through a structured program at the Carriage House. And the discrepancy between Dr. Marshall's opinion restricting Harris to a very structured, low stress, low demand environment, which the ALJ said he gave "controlling weight," and the RFC he ultimately assigned, may not be harmless. *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the case). Therefore, upon remand, the ALJ should reexamine Harris's RFC with respect to the

17

medical source opinions of record.[6] *See Clifford*, 227 F.3d at 872 (emphasizing that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion").

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this Opinion.  The Clerk is directed to enter a judgment in favor of Harris and against the Commissioner.

SO ORDERED.

Enter for this 26th day of November, 2012.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge

---

[6] Because a remand is warranted on other grounds, the Court need not reach Harris's third argument concerning the testimony of Ms. Hortzman and Ms. Anderson.